COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 


 
 
  
 RAYMOND SANCHEZ,
  
                             Appellant,
  
 v.
  
 THE STATE OF TEXAS,  
  
                             Appellee. 
  
 
 
 §
  
 §
  
 §
  
 §
  
 §
  
 §
 
  
 
 
  
 No.
 08-10-00321-CR
  
 Appeal
 from the
  
 175th
 Judicial District Court
  
 of
 Bexar County, Texas 
                                     
 (TC#
 2008CR5899) 
 
 


O P I N I O N

            Raymond Sanchez was convicted of aggravated
assault of a child and indecency with a child by contact.  He was sentenced to twenty (20) years’ in
prison for the assault and ten (10) years’ of probation for indecency, to be executed
concurrently.  On appeal, he contends
that the State withheld Brady
material and that his trial attorneys were ineffective.  We affirm.

Background

Trial Evidence

            The evidence at the guilt-phase of trial
consisted solely of the victim’s testimony. 
On direct examination, Renessa Segura testified that she was born in
March 1983 and that she was twenty-seven-years-old at the time of trial.  Her mother was married to Sanchez when Segura
was a child.  The events giving rise to
the charges against Sanchez occurred when Segura was in the first or second
grade.  Sanchez and Segura’s mother have
a son, also named Raymond, who was born in November 1988.  Raymond and Segura’s younger sister shared a
bedroom, while Segura had her own bedroom. 
Their mother worked the graveyard shift, so the children were often left
alone with Sanchez at night.

On one of those nights, Segura and her siblings were asleep on the
living room floor.  Segura was awakened
when Sanchez stuck his finger inside her vagina.  That was the first time that Sanchez assaulted
her.  When asked if this was the only
time that something like this happened, she answered, “No.  It was a lot of times.”  It happened “maybe more than 10 times.”  

After the first incident on the living room floor, the remaining
incidents occurred mostly on the bed in her bedroom, while her siblings were
asleep beside her.  Sanchez would bring
the other children into the room, and they would all sleep in the same
bed.  During this time, her brother was
perhaps one- or two-years’ old, was not an infant, and was old enough to sleep
in a bed.  When asked how many times it
happened in her bed, she estimated, “five, six, seven times.  Maybe seven times.”  In all of these incidents, Sanchez put his
finger in her vagina.

Segura also testified about two other specific incidents.  On one occasion, Sanchez took her from her
bed and carried her downstairs to the master bedroom.  Segura claimed, “I remember him making me
take off my clothes and getting on top of him.” 
He then penetrated her with his penis. 
That was the only time that this occurred.

The other specific incident happened in December 1991, after her mother
gave birth to a stillborn child.  Sanchez
retrieved Segura and her siblings from her grandmother’s house, and Segura
believed he was going to drive them to the hospital.  While driving, Sanchez said that her mother
“had lost her baby and he seemed kind of upset and crying.  He was mad.” 
Instead of going to the hospital they “ended up parking somewhere like
at a park kind of.  I remember he was
already trying to put his hands in my underwear again.  He told me . . . to take off my underwear.  . . . 
And while I was doing that, he was unbuckling his pants and his
belt.  And at that time, I guess he
wanted me to . . . get on him, and a car pulled up.”  She and Sanchez were in the front seat, and the
other children were asleep in the back.

After this incident, Sanchez touched her inappropriately “maybe two or
three times.”  The abuse ended because
she went to live with her grandmother.

Initially, Segura did not tell anyone about the abuse because she
thought that no one would believe her.  Later,
Sanchez advised her not to tell anyone or else CPS would take her away from her
mother and she would never see her mother again.

The first person she told about the abuse was her mother-in-law.  This happened in 2006 or 2007, when Segura
was twenty-three or twenty-four years’ old. 
To explain why she told her mother-in-law at that time, Segura
testified:  “I had an episode where I was
just crying and was frustrated . . . my life . . . was a big wreck because of
what happened to me.  It was controlling
me.  And I felt like I needed to say
it.  I needed to tell somebody.  I needed to release it.”  About two months later, she told her mother,
but she did not report the abuse to the police until a confrontation occurred
between Sanchez, her mother, and her brother Raymond on Thanksgiving 2007.

Segura is estranged from Raymond. 
He has two children who were in Segura’s mother’s custody at the time of
trial because Raymond had “problems with CPS” and “was on drugs.”  On Thanksgiving 2007, Raymond and Sanchez
went to Segura’s mother’s house to pick up the children, but her mother refused
to give them up.  Afterwards, Sanchez
called Segura’s mother on the phone, “cussing her out, calling her a bitch and
that he was going to kill her and was going to mess her up . . . .”  Segura then decided to make a police report
regarding his abuse of her when she was a child.  She was worried that the same things that
happened to her could happen to Raymond’s children.

On cross-examination, Segura acknowledged that Sanchez was granted
custody of Raymond upon his divorce from her mother.  She also admitted that Raymond and Sanchez
had obtained a police escort to her mother’s house on Thanksgiving 2007 “to
make sure everything was okay.”

Defense counsel challenged Segura’s recollection about the time when the
abuse occurred.  She believed that she
was five- or six-years’ old when the living-room-floor incident happened and
when the penetration occurred, and that all of the incidents occurred between
the ages of five and seven.  This would
mean that her brother Raymond was “either a year or two maybe.”  Yet he was sleeping upstairs in a bunk bed.  Counsel noted that when she was five, Raymond
had not been born.  Counsel also pointed
out that the stillborn birth occurred in December 1991, and Segura agreed that
she would have been eight, “going on nine” then.

Much of the cross-examination focused on the statement that Segura had
given to the police after the Thanksgiving 2007 incident.  Defense counsel got Segura to admit that
several allegations in the statement were incorrect.  Although her statement said that she was four
or five when Sanchez married her mother, she admitted that she did not know
when they married.  She acknowledged that
her statement was incorrect in saying that Sanchez began touching her while her
mother was pregnant.  The statement was
internally inconsistent in that it first says that Sanchez never asked her to
touch him, but later says that he made her touch his penis.

In addition, there were inconsistencies between the statement and Segura’s
direct examination testimony.  In the
statement, unlike at trial, Segura said that Raymond was an infant when the
abuse occurred and that Raymond was still sleeping in his parents’ bedroom
during the period when the penetration occurred.  Also contrary to her trial testimony, her
statement said that the assaults occurred every night.  Segura attempted to explain this discrepancy
by saying that “[i]t seemed like every night.” 
Segura also admitted that there was a discrepancy between her
description of the penetration incident in the statement and at trial.

Segura testified that she told her mother-in-law about the abuse in 2006
and that she told her mother a few months later.  But she did not remember exactly when she
told her mother.  It could have been
before or after Thanksgiving.  Her
statement said that she made the police report on the same day that she told her
mother.  When defense counsel pointed out
that the police report occurred around Thanksgiving 2007, Segura stated, “I
made it [the police report] after Thanksgiving. 
The day after Thanksgiving, but I don’t remember what year it was, if it
was that same year I told her or the following year.”  Counsel asked, “So this statement might be –
part might also be incorrect?”  Segura
responded, “Might. Yes.”

Segura could not remember where her mother was employed when she worked
the graveyard shift, but she remembered the name of Sanchez’s employer.

Finally, counsel asked Segura whether she saw a counselor or therapist
when she was a child.  She answered that
both she and her sister did.  Counsel
then asked whether anyone recommended that she see someone for depression when
she was in the first grade, and Segura answered, “No.”[1]  Counsel said, “No? Okay.”  At that point, Segura volunteered, “Well, I
went to counseling, me and my sister, in elementary.  I had drawn some pictures that were
unappropriate [sic] and CPS did get involved. 
And we had to go through counseling.” 
Counsel then passed the witness.

On re-direct, the prosecutor asked Segura what was inappropriate about
the pictures she drew.  The trial court
overruled defense counsel’s relevance objection, and Segura stated that the
pictures were of a penis.

In his closing argument, defense counsel concentrated on Segura’s
credibility, particularly her lack of consistency.  He emphasized that the timeline of events was
unclear.  Referring to Raymond’s age at
the time of the abuse, counsel posited that it was unlikely that a one- or two-year-old
child was sleeping in a bunk bed upstairs. 
He suggested that the fact that Segura’s mother worked the graveyard
shift was important because that is how the prosecution established Sanchez’s
opportunity to commit the assaults.  He
then noted that Segura could not say where her mother worked the graveyard
shift, yet she knew the name of Sanchez’s employer.  Counsel argued that it was unreasonable to
believe that Sanchez would take the other children, potential witnesses, with
him to commit the abuse and that it was also unreasonable to believe that he
would decide to commit a sex offense at “the worst moment of his life,” when his
child was stillborn.  Counsel asserted
that Segura made these allegations against Sanchez to help her mother maintain
custody of Raymond’s children.

In her closing argument, the prosecutor emphasized Segura’s testimony
about drawing pictures of penises.  She stated
that the drawings were important “because this is something that is consistent
with a child being molested.”  Continuing
further, the prosecutor stated:

Just think about what would have
been going through that little girl’s mind at that time when CPS is
investigating her.  Do you think she is
going to tell what happened?  The exact
thing that the Defendant was threatening her with, CPS is going to come and
take you away from your mother.  You are
never going to see her again.  Do you
think that at that point she was going to tell what was happening?  No. 
And she didn’t tell back then and she didn’t tell anyone for a really
long time because she was worried that nobody would believe her.  Which is a really common thing.

 

Later, the
prosecutor used the drawings to challenge the defense theory that Segura
fabricated the charges against Sanchez to help her mother maintain custody of Raymond’s
children.  She said, “But think about
these dates.  That [the custody fight]
does not explain drawing penis pictures when you are in elementary school.”

Motion for New Trial Evidence

After his conviction and sentencing, Sanchez retained a new attorney,
who filed a motion for new trial on his behalf. 
In the motion for new trial, counsel argued that the prosecution
violated Brady v. Maryland by failing
to disclose the CPS investigation that resulted from Segura’s inappropriate drawings.  Counsel also argued that Sanchez’s trial
attorneys were ineffective.

            Joseph Acevedo, Sanchez’s primary
trial attorney, testified at the hearing on the motion for new trial.  At the time of trial, he had been
representing Sanchez for approximately two years, during which time Sanchez
always professed his innocence.  Sanchez
advised him that there was a history of acrimony between himself and Segura’s
mother, and in particular that “she had engaged in assaultive behavior with
him.”  It appeared that Segura’s
allegations were part of a “power struggle” that had been going on for about
twenty years.  Acevedo interviewed
Sanchez’s son Raymond, who essentially agreed with his father’s view of the
family relationships, and Sanchez’s sister, who told him that Segura’s mother
did not work the graveyard shift during the time in question.

            Through an error by either the trial
court’s staff or Acevedo’s staff, Acevedo did not realize that the trial date
had been set until the trial was imminent. 
About a week before trial, Acevedo filed several pretrial motions.  He did this because he received “a postcard
that said it was set for motions,” but “[s]oon thereafter, [he] was told it was
not motions, and it was the trial . . . .” 
At that time, both his wife and father-in-law were ill, so he thought it
would be in Sanchez’s best interest to call in another attorney for
assistance.  He secured the help of Brian
Powers, a former prosecutor.

In Acevedo’s view, the State’s case hinged on Segura’s credibility.  Acevedo testified that there was nothing in
the State’s file about a CPS investigation, and that the testimony regarding
the investigation came as a surprise.  He
believed that Segura’s inconsistencies should have been enough for the jury to
acquit Sanchez, but “when there was testimony about CPS . . . that was
[something] that we were not prepared to address, because there was nothing in
the file . . . .”  Acevedo considered the
CPS testimony to be so damaging that it resulted in the conviction.  The defense strategy would have been
different if he had known about the CPS investigation.

Powers testified that Acevedo called him for assistance the day before
trial was set to begin.  He reviewed the
State’s file on the day of trial, and did not find any reference to a CPS
investigation.  Powers also interviewed
Sanchez, his sister Julie, his son Raymond, and two of Raymond’s former
girlfriends.  They advised him that the
allegations against Sanchez were made in the context of a long-running family
dispute.  Sanchez and Segura’s mother had
fought over the custody of Raymond.  In
addition, Julie told him that she lived with Sanchez and Segura’s mother while
Segura’s mother was pregnant with the child that was stillborn.  According to Julie, Segura’s mother did not
work during that time.  Powers was also
aware that Segura’s mother had a record of committing assaults.  He knew that there had been an allegation
that Sanchez sexually abused Raymond’s daughter, but he did not recall that CPS
had ruled out that allegation.

Like Acevedo, Powers believed the primary issue was Segura’s
credibility.  The defense theory was that
Segura had a reason to lie because of the ongoing child custody dispute, which
was part of a larger family dispute stretching back for decades.  The defense did not call witnesses to testify
about the family history for strategic reasons. 
At the completion of Segura’s testimony, Powers believed the State had
not proven its case beyond a reasonable doubt. 
He also had “some impeachment concerns” regarding the potential defense
witnesses.  Powers recalled that Raymond
had a criminal history, but he could not recall whether other family members
had a criminal history.  Powers was also
concerned that the family history might not be deemed relevant, as it related
more to Segura’s mother than to Segura herself. 
It was a “setback” for the defense when Segura testified about having
drawn pictures of penises.

The prosecutor testified that she never had any sort of report from CPS
regarding Segura.  She did not try to
obtain any records from CPS because Segura did not tell her about the CPS
investigation until either the day before, or the day of, trial.

Sanchez’s attorney offered affidavits by Sanchez, his son Raymond, and
his sister Julie, at the new trial hearing. 
Sanchez averred that he was awarded the marital home and managing
conservatorship of Raymond when he and Segura’s mother divorced.  Segura’s mother was angry about the custody
decision and about having to pay him child support.  She harassed him for years and committed acts
of vandalism against him.  When the CPS
case was opened against Raymond, allegations of sexual abuse were made against
Sanchez, but those allegations were ruled out by CPS.  Sanchez also described the events that
occurred around Thanksgiving 2007.  He
stated that he called the police for an escort to ensure that there “would be
no trouble.”  When Segura’s mother
refused to open the door, he told her that he “hoped she would rot in
hell.”  Before his indictment, he had
another argument with Segura’s mother about Raymond’s children.  Segura’s mother told Sanchez that she was
“going to get” him.  Sanchez claimed that
he gave all this information to Acevedo during their first meeting.  After their first meeting, he only spoke with
Acevedo at docket calls until just before the trial began.

In his affidavit, Raymond stated that trial counsel did not interview
him until the week of trial.  Although he
was at the courthouse and available to testify, counsel told him that he would
not be called because of a pending motion to revoke his probation.  He asked counsel to resolve the motion, which
involved only technical violations, so he could testify.  Raymond stated that he did not believe the
charges against his father and he described the testimony he would have given
about the charges.  The affidavit
includes many details about Raymond’s interactions with CPS concerning his own
children.  Although the affidavit notes
that Raymond, his girlfriend, and Sanchez tested negative for the use of drugs
and that CPS ruled out the allegations that Sanchez had sexually abused his
granddaughter, it also mentions that Raymond was arrested for assaulting his
girlfriend.

In her affidavit, Julie averred that she spoke with defense counsel for
the first time during the week of trial and she was available to testify at the
guilt-phase.  She claimed that she lived
with Sanchez and his wife for three-to-five months in 1991.  During that time, Segura stayed at her
grandmother’s house most of the time.  The
affidavit does not state that Segura’s mother did not have a job during that
time.

The remaining evidence at the hearing consisted of documents, such as
divorce papers, a court-ordered social study arising from the custody dispute
over Raymond, and a home study regarding the custody dispute over Raymond’s
children.  In her summation of the
evidence at the hearing, Sanchez’s attorney noted, among other things, that
after the CPS investigation was raised at trial, trial counsel “did not request
access to the CPS report, which I don’t even know if it exists.  Certainly the State never had it in this
file.  So, you know, whether it ever existed
is certainly debatable.”  The trial court
denied the motion for new trial.

Issues on Appeal

Brady Material

            In his first issue, Sanchez asserts
that the State suppressed Brady
material and then used the related evidence to corroborate Segura’s
testimony.  As explained in Sanchez’s
opening brief, the prosecutor suppressed the “significant information” that it
did not have a CPS report of an investigation into Segura’s inappropriate
drawings.  Although it is clear that the
prosecution did not have a CPS report, it “questioned Segura as if such a
report existed.”  The prosecution then
used the CPS investigation in closing argument to bolster Segura’s testimony by
arguing that the drawings and the ensuing investigation were consistent with
Segura’s allegations.

            In Brady v. Maryland, the Supreme Court held that “suppression
by the prosecution of evidence favorable to an accused . . . violates due process where the
evidence is material either to guilt or to punishment . . . .”  373 U.S. 83, 87, 83
S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). 
To demonstrate reversible error under Brady, Sanchez must show that suppressed information was favorable
to him.  Pena v. State, 353 S.W.3d 797,
811 (Tex.Crim.App. 2011).  “Favorable
evidence includes exculpatory evidence as well as impeachment evidence.  Exculpatory evidence is
that which may justify, excuse, or clear the defendant from alleged guilt, and
impeachment evidence is that which disputes, disparages, denies, or contradicts
other evidence.”  Pena, 353 S.W.3d at 811-12.  Sanchez
contends that the prosecution’s lack of a CPS report is impeachment evidence
because, if the defense had known that there was no CPS report, it could have
used that fact to impeach Segura’s testimony that there was a CPS
investigation.  He also asserts that if
CPS records showed that Segura had not reported sexual abuse by Sanchez, the
records would have supported his innocence.

Brady
only applies when the defense discovers information that was known to the
prosecution but unknown to the defense.  Id. at 810.  Brady
does not require the State to disclose information to defendants that the State
does not have in its possession and that is not known to exist.  Id.  Nor does Brady
require the prosecution to discover information that it does not possess.  Goff v.
Bagley, 601 F.3d 445, 476 (6th Cir. 2010). 
It is undisputed that both of Sanchez’s attorneys reviewed the
prosecution’s file and found no CPS report. 
Thus, it was apparent that the prosecution did not have a CPS
report.  Whether any CPS report actually
exists is still an open question.  Furthermore,
there is nothing in the record to indicate that defense counsel was unaware
that Segura made her first outcry when she was an adult.  Thus, it was apparent that Segura did not
report the sexual abuse during any CPS investigation into the inappropriate
drawings.

Because Sanchez has not shown that
the prosecution possessed impeachment evidence that was unknown to the defense,
he has not demonstrated reversible error under Brady.  His first issue is,
accordingly, overruled.[2]

Ineffective Assistance

            In his
second issue, Sanchez asserts that he received ineffective assistance of
counsel at trial.  He contends that his
attorneys were ineffective in seven ways:  (1) failing to begin trial preparation until
only days before trial; (2) failing to obtain rulings on motions; (3) failing
to conduct an independent investigation of defensive matters; (4) failing to
call available witnesses and use available documentary evidence; (5) failing to
object to the admission of extraneous offense evidence; (6) failing to object
or move for a continuance when surprised by Segura’s testimony about the
inappropriate drawings; and (7) failing to object to the prosecutor’s improper
closing argument.

            To prevail on his claim of ineffective
assistance of counsel, Sanchez must show that his attorneys’ representation
fell below an objective standard of reasonableness and that there is a
reasonable probability that the result of the proceeding would have been
different if not for their errors.  Strickland v. Washington, 466 U.S. 668,
687-88, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984); Lopez v. State, 343 S.W.3d 137, 142 (Tex.Crim.App. 2011).  In evaluating the attorneys’ performance, we
must presume that it fell within the wide range of reasonably professional assistance.  Lopez,
343 S.W.3d at 142.  Any
deficiency must be affirmatively demonstrated in the trial record; we cannot
engage in retrospective speculation.  Id.  If the record does not reveal the
attorneys’ reasons for the challenged conduct, we must “assume that
counsel had a
strategy if any
reasonably sound strategic
motivation can be
imagined.”  Lopez, 343 S.W.3d at 143.

            In his affidavit, Sanchez indicated
that Acevedo interviewed him at the beginning of the representation.  Beyond this meeting, however, the record
suggests that Acevedo did not begin preparing for trial until just days before
it was scheduled to begin.  Shortly
before trial, Acevedo filed a plethora of motions, but failed to obtain a
ruling on most of them.  He also retained
Powers, and both attorneys reviewed the State’s file and interviewed Sanchez
and potential witnesses.

“[T]o establish that counsel was
ineffective due to failure to investigate, an appellant must state with
specificity what such investigation would have revealed, what specific evidence
would have been discovered, and how the evidence would have altered the outcome
of the trial.”  Flowers
v. State, 133 S.W.3d 853, 858-59
(Tex.App.--Beaumont 2004, no pet.).  Sanchez has not identified any
evidence or strategies that counsel could have pursued if they had begun
preparation sooner.  Nor has he
identified any significant information that counsel would have discovered if
they had conducted a more thorough or timely investigation.  Instead, Sanchez focuses on counsel’s failure
to make use of all of the available documents and witnesses.

For example, there is documentary evidence to establish some of the
relevant dates, such as the date of birth for the stillborn child.  Because the relevant dates were established
through testimony at trial, counsel were not ineffective in failing to offer
the documentary evidence.

Most of the unoffered evidence relates to the hostility that Segura’s
mother has for Sanchez.  There is
documentary evidence showing that Sanchez was awarded the marital home and
custody of Raymond and that Segura’s mother failed to pay child support.  The information about Raymond’s custody and
the marital home was established through testimony at trial.  Sanchez does not explain how the fact that
Segura’s mother failed to pay child support for Raymond is relevant to Segura’s
allegation that Sanchez sexually abused her.

Sanchez asserts that his sister Julie could have testified about
Segura’s mother’s anger toward him.  He
also points to a home study regarding Raymond’s children.  The study recommended that the children not
be placed with Segura’s mother because of her significant criminal history and
the fact that her adult children had violent tendencies.  All of the evidence concerning Segura’s
mother was, at best, only minimally relevant. 
Segura’s mother did not testify at trial, so Sanchez had no basis for
impeaching her.  To the extent that the
evidence showed family acrimony, it was cumulative of other evidence admitted
at trial.  None of the negative
information about Segura’s mother directly refuted any element of the charges
against Sanchez.  See Smith v. State, 340 S.W.3d 41, 54 (Tex.App.--Houston [1st
Dist.] 2011, no pet.)(holding that evidence that child victim’s mother was
“hateful” toward defendant, her former husband, was only minimally probative
because it was cumulative and did not directly refute the elements of the
charges, which were established by the victim’s testimony).

In addition to its minimal relevance, there may have been several other
problems with admissibility of the home study. 
Assuming that it would have been admissible, it could have opened the
door to negative information about Sanchez. 
For example, the study notes that Segura’s mother had “not had an
opportunity to cope with the severe physical and emotional abuse she endured
during her first three marriages.”

Turning to the late-filed motions, with one exception, Sanchez does not
identify any prejudice from counsel’s failure to file, or obtain a ruling on, the
motions sooner.  The exception concerns
extraneous offense evidence.  Counsel
requested notice of extraneous offense evidence less than a week before
trial.  The State provided the notice on
the day trial began.  Included within the
notice was evidence that Sanchez threatened to kill Segura’s mother on or about
November 26, 2007.  Sanchez suggests that
his attorneys did not have sufficient time to investigate the claim of a threat.  However, there is no indication that counsel
were unaware of the Thanksgiving 2007 incident or that the threat claim was
susceptible to in-depth investigation.  In
their affidavits, Sanchez and Raymond did not deny that a confrontation
concerning Raymond’s children occurred that day.  Exactly what transpired in the phone
conversation between Sanchez and Segura’s mother would simply be a “he said/she
said” contest.

            Sanchez also argues that trial
counsel did not make the proper objection at trial to evidence about the
threat.  Segura testified that when her
mother refused to let Sanchez and Raymond take Raymond’s children, Sanchez
threatened to kill her mother.  The
prosecutor asked Segura what she did after that threat was made.  Segura responded, “Nothing.  When he went to pick up the kids, I kind of
went into a room by myself.  . . .  I didn’t want to hear anything.  I didn’t want to know anything.”  The prosecutor’s next question was, “When did
you decide to go to the police to make a report about this incident when you
were little?”  Segura answered, “[W]hen I
was in the room when all of this was going on, my husband walked in there.  And I just told him that I was tired and I
needed to do something, that if I didn’t do something it was going to happen to
somebody else.”

            Sanchez argues that his trial
counsel should have objected to testimony about the threat, or at the very
least requested a limiting instruction, because it revealed an inadmissible
extraneous offense.  See Tex.R.Evid.
404(b)(providing that extraneous offenses are not admissible to prove character
conformity).  Although both of Sanchez’s
trial attorneys testified at the hearing on the motion for new trial, they were
not given the opportunity to explain why they did not make an objection under
Rule 404(b).[3]  Accordingly, we cannot find that they were
ineffective in this regard unless it is apparent from the record.  The record must demonstrate that the
attorneys’ performance fell below an objective standard of reasonableness as a
matter of law and that no reasonable trial strategy could justify their failure
to object.  See Lopez, 343 S.W.3d at 143.

To show that counsel was deficient in failing to make a Rule 404(b) objection,
Sanchez must show that the trial court would have been required to sustain the
objection.  See Ex parte White, 160 S.W.3d 46, 53 (Tex.Crim.App. 2004).  However, the evidence was arguably admissible
to explain why Segura finally reported the abuse to the police.  See
Tex.R.Evid. 404(b)(providing that
extraneous offenses may be admissible for purposes other than character
conformity).  In their closing arguments,
both the prosecutor and defense counsel indicated this understanding as to why
the evidence was admitted.  Referring to
the threat, defense counsel argued, “[S]uddenly that’s another reason for why
we should be calling the police and reporting something that allegedly happened
over a decade before.”  The prosecutor
noted, “And that day, after he threatened her mother, [Segura] decided she was
sick of it.  She told her husband . . . I’m
going to go to the police.”

Even if the testimony was inadmissible, Sanchez has not shown a reasonable
probability that the result of the trial would have been different if it had
not been admitted.  There was little mention
of the threat during Segura’s direct testimony, and the prosecutor did not
emphasize the substance of the threat during closing argument.  The threat did not concern the type of
conduct for which he was being tried; it did not suggest any predilection to
sexually abuse children.  Moreover, to
the extent that the threat demonstrated the acrimony between Sanchez and Segura’s
mother, it supported the defense’s theory of the case.  Consistent with the defense’s theory, the
jury could have inferred that Sanchez’s threat and Segura’s allegations about
sexual abuse were both parts of the long-running family feud.  Finally, it is unlikely that the jury would
have convicted Sanchez of sexually assaulting a child based on an angry threat
made in the context of the long-running feud. 
See Daggett v. State, 187
S.W.3d 444, 451 (Tex.Crim.App. 2005)(noting that extraneous offense evidence “forces
the defendant to defend himself against uncharged crimes as well as the charged
offense, and encourages the jury to convict a defendant based upon his bad
character, rather than proof of the specific crime charged”).

Sanchez also faults his trial counsel for not requesting a continuance
on the ground that they were surprised by Segura’s testimony that she made the
inappropriate drawings as a child.  He
argues that if a continuance had been granted, counsel would have learned that
the prosecution did not have a CPS report. 
As explained above, counsel already knew that the prosecution did not
have a CPS report because it was not included in the State’s file.  Regardless of whether the prosecution had a
copy of a CPS report, Sanchez has not established that no CPS investigation was
conducted.  Therefore, he has not
demonstrated that he would have benefitted from a continuance.    

            Sanchez’s last allegation of
ineffectiveness is that counsel failed to object to improper jury
argument.  He contends that the
prosecutor argued facts outside the record and injected her own opinion
testimony to corroborate Segura’s allegations.

Sanchez refers to the prosecutor’s argument that Segura’s drawings were
“consistent” with sexual abuse.  As
Powers testified at the new trial hearing, this argument was a reasonable
inference from the evidence.  See Berry v. State, 233 S.W.3d 847, 859 (Tex.Crim.App. 2007)(stating
that reasonable deductions from the evidence may be included in closing
arguments).

Sanchez also refers to the
prosecutor’s argument that Segura did not fabricate her allegations to help her
mother in the child custody case.  The
prosecutor argued that the child custody case “doesn’t explain why, in May of
2006, before the granddaughter was born, she told her mother-in-law.  Because that little girl they said was three
years old.  Well, she was born in 2007,
and she told her mother-in-law in May of 2006 about what the Defendant had done
to her, when there was no custody battle going on.”  Sanchez argues that there is no evidence as
to the date Segura made her outcry to her mother-in-law or as to when Raymond’s
daughter was born.  Sanchez is
mistaken.  Segura testified that
Raymond’s daughter was three years old at the time of trial.  Since the trial occurred in June 2010, the record supports the prosecutor’s assertion
that the child was born in 2007.  As
discussed above, Segura seemed unsure about the exact date of her outcry.  But she did testify at one point that she
told her mother-in-law about the abuse in April or May of 2006.  Therefore, the prosecutor did not argue facts
outside the record.

We conclude that the record, even
considering the motion for new trial evidence, is not sufficiently developed to
establish that Sanchez was denied the effective assistance of counsel.  See
Lopez, 343 S.W.3d at 143-44.  Sanchez’s
second issue is therefore overruled.

 

Conclusion

            Having
overruled both issues raised by Sanchez, we affirm the judgment of the trial
court.

 

 

March 14, 2012

                                                                        CHRISTOPHER
ANTCLIFF, Justice

 

Before McClure, C.J., Rivera, and Antcliff, JJ.

 

(Do Not Publish)











[1] In direct
examination, while trying to define the period of time in which the assaults occurred, Segura had mentioned that she
failed the first grade two times.  The
prosecutor asked about the problems she was having in school.  Segura stated that she was not concentrating,
her grades dropped, she “was real depressed,” and she “had to do counseling
when [she] was in school.”





[2]
In his reply brief, Sanchez argues that “it was the fact of Segura’s
eve-of-trial information . . . which should have [been] disclosed to the
defense under Brady.”  He contends that the defense could have
impeached Segura and could have charged her with a recent fabrication, if it
had known that she failed to disclose the CPS investigation until either the
day before or the day of trial.  This
contention is waived because it was not included in Sanchez’s opening
brief.  See Ontiveros v. State, 890 S.W.2d 919, 931 (Tex.App.--El Paso
1994, no pet.); Heras v. State, 786
S.W.2d 72, 72-3 (Tex.App.--El Paso 1990, no pet.).  In any event, Sanchez has not cited, and we
have not found, any authority suggesting that Brady requires the prosecution to advise the defense of the dates
on which it received inculpatory information.





[3]
One of the attorneys did make a hearsay objection to the testimony.